UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
J.C.S. and D.S. on behalf of their minor child, J.S.,

                                        Plaintiffs,                          **OPINION AND ORDER**

         - against -                                                          No. 12-CV-2896 (CS)

BLIND BROOK-RYE UNION FREE SCHOOL
DISTRICT,

                                        Defendant.
-----------------------------------------------------------------------x

<u>Appearances</u>:

Neal H. Rosenberg
Law Offices of Neal H. Rosenberg
New York, New York
*Counsel for Plaintiffs*

Christopher P. Langlois
Girvin & Ferlazzo, P.C.
Albany, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

         Before the Court are Defendant's Motion for Summary Judgment, (Doc. 7), and

Plaintiffs' Cross-Motion for Summary Judgment, (Doc. 20).  Plaintiffs J.C.S. and D.S.

(collectively, "the Parents") bring this action on behalf of their child J.S. ("JS"), pursuant to the

Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1401 *et seq.*,[1]

against Defendant Blind Brook-Rye Union Free School District (the "District").  Plaintiffs seek

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the IDEIA.  All references to and cases cited herein discussing the IDEA remain authoritative.

review of an administrative decision by a State Review Officer ("SRO") at the New York State Education Department reversing the decision of an Impartial Hearing Officer ("IHO").[2]

The IHO found that (1) the District had failed to offer JS a free and appropriate public education ("FAPE") for the 2010-2011 school year, (IHO Decision 10-12), (2) the day portion of the private school – Eagle Hill School ("Eagle Hill") in Greenwich, Connecticut – at which JS's parents placed him for the 2010-2011 school year was an appropriate placement for JS, but the residential portion was not, (*id.* at 12-15), and (3) there were no equitable considerations precluding tuition reimbursement for the day program, (*id.* at 15).  Accordingly, the IHO ordered the District to reimburse the Parents for the day program portion of Eagle Hill's tuition in the amount of $54,800.  (*Id.* at 16.)

The SRO disagreed with the IHO and determined that the District had offered JS a FAPE for the 2010-2011 school year.  (SRO Decision 12-20.)  Because the SRO concluded that the District had offered JS a FAPE, the SRO did not find it necessary to determine whether Eagle Hill was an appropriate placement for JS or whether equitable considerations undermined the Parents' claim, and dismissed the Parents' cross-appeal accordingly.  (*Id*. at 20.)

Defendant seeks an Order from this Court affirming the decision of the SRO that a FAPE was offered for the 2010-2011 school year.  (D's Mem. 1.)[3]  Plaintiffs seek an Order vacating the

---

[2] "IHO Decision" will refer to the decision of IHO Martin Schiff dated September 4, 2011.  (Affidavit of Christopher P. Langlois ("Langlois Aff."), (Doc. 10), Ex. D.)  This document also forms part of the administrative record that was filed under seal with this Court.  (Doc. 36.)  "SRO Decision" will refer to the Decision of SRO Justyn P. Bates, dated December 15, 2011, in Appeal No. 11-128.  (Langlois Aff. Ex. C.)  The SRO Decision is also available at http://www.sro.nysed.gov/decisionindex/2011/11-128.pdf.   The exhibits cited herein, also part of the administrative record, are referred to according to the name of the party that apparently submitted them – "Parent Ex." and "District Ex."

[3] "D's Mem." refers to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment.  (Doc. 9.)

SRO's decision, granting the relief directed by the IHO, and further granting reimbursement for Eagle Hill's residential program.  (Ps' Mem. 24.)[4]

For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Summary Judgment is DENIED.

## I. <u>Background</u>

The relevant facts are undisputed except where noted.  The reader is directed to the decision of the SRO, which provides a thorough recounting of the factual background of this case.  I recount here only some of the facts.

JS was born in 1998.  (Ps' 56.1 Resp. ¶ 3.)[5]  Shortly before his fifth birthday, he was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").  (*Id.* ¶ 4.)  At the age of five, JS entered the District as a kindergarten student for the 2003-2004 school year.  (*Id.* ¶ 5; D's 56.1 Resp. ¶ 2.)[6]   In October 2003, JS was referred to the District's Committee on Special Education ("CSE") for evaluation, and the CSE classified him as "other health impaired."  (Ps' 56.1 Resp. ¶ 6.)  JS repeated kindergarten during the 2004-2005 school year and remained enrolled in the District through fourth grade (2008-2009).  (*Id.* ¶ 7; SRO Decision 2 n.1.)

During fourth grade, JS initially participated in a 30-minute social skills group once every six days and received two hours per week of indirect consultant teacher services, a full-time shared aide, and various program modifications and testing accommodations.  (SRO Decision 2;

---

[4] "Ps' Mem." refers to Plaintiff's [*sic*] Memorandum of Law in Support of His [*sic*] Motion for Summary Judgment. (Doc. 21.)

[5] "Ps' 56.1 Resp." refers to Plaintiffs' Responses to Defendant's Local Rule 56.1 Statement of Material Facts.  (Doc. 26.)

[6] "D's 56.1 Resp." refers to Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Material Facts.  (Doc. 23.)

2008-09 IEP 1-2.)[7]  Additionally, the Parents hired two special education tutors to assist JS outside of school.  (Tr. 240.)[8]  JS's mother testified that despite these special education supports, JS was not having a successful fourth-grade year.  (*Id.*)  Accordingly, the Parents requested a program review during the middle of the year to get JS additional support in school.  (*Id.* at 241; *see* Parent Ex. L.)  For the remainder of his fourth-grade year, the District provided JS with, among other supports, direct consultant teacher services, resource room services, and individual counseling services, but JS's mother testified that she still did not notice any change in JS's performance.  (Tr. 242; SRO Decision 2.)

In spring 2009, JS underwent a comprehensive psychoeducational evaluation by Dr. Gottesfeld, a private psychologist.  (SRO Decision 2.)  Dr. Gottesfeld administered numerous formal tests during the course of this evaluation, the results of which are recounted in great detail in his report dated June 10, 2009, (*see generally* Gottesfeld 2009 Report),[9] and are fairly summarized by both the IHO, (*see* IHO Decision 7), and the SRO, (*see* SRO Decision 2-3).  Although Dr. Gottesfeld found that JS was a "bright boy" with "fundamental academic skills [that] are relatively well established," he also noted that JS "struggles with the day to day demands in the academic arena [and] is awkward in the social arena."  (Gottesfeld 2009 Report 15.)  Specifically, Dr. Gottesfeld diagnosed JS with a hybrid learning disability, which he described as a combination of "trouble formulating and conveying what it is he means to say (language processing deficit), difficulty organizing his perceptions and differentiating what is essential from what is less important (perceptual deficit), and significant inattention ([ADHD])."

---

[7] "2008-09 IEP" refers to the Individualized Education Program ("IEP") developed for JS in 2008-2009.  (Parent Ex. M.)

[8] "Tr." refers to the transcript of the hearing held before the IHO.  This document forms part of the administrative record that was filed under seal with this Court.  (Doc. 36.)

[9] "Gottesfeld 2009 Report" refers to the June 10, 2009 Psychoeducational Evaluation prepared by David Gottesfeld, Psy. D., based on his April, May, and June 2009 observations of JS.  (District Ex. 1.)

(*Id.*)  Dr. Gottesfeld made eleven specific recommendations including that the Parents consider making an application to Eagle Hill; several multisensory and structured programs to address JS's academic needs; a physician consult to reassess JS's medical regimen; a comprehensive speech-language assessment; and counseling to increase coping skills and social prowess.  (*Id.* at 17-19.)

The Parents decided to withdraw JS from the District in fifth grade (2009-2010) and enrolled him as a day student at Eagle Hill.  (Ps' 56.1 Resp. ¶ 8.)  The Parents did not file an impartial hearing request or seek tuition reimbursement with respect to JS's unilateral placement at Eagle Hill for the 2009-2010 school year.  (*Id.* ¶ 9.)

In December 2009, the District contacted the Parents for consent to evaluate JS as part of a triennial review.  (SRO Decision 3.)  The parties subsequently agreed, however, that Dr. Gottesfeld's June 2009 evaluation would provide sufficient evaluative information for JS, and therefore no evaluation was performed at that time.  (*Id.*; P's 56.1 Resp. ¶ 14.)

On February 18, 2010, in preparation for the 2010-2011 CSE meeting, the District's Director of Pupil Services, Harry Burg, observed JS during a 35-minute literature class at Eagle Hill.  (Ps' 56.1 Resp. ¶ 12; Tr. 61-62; District Ex. 6.)  There were six other students present in the class.  (District Ex. 6.)  Mr. Burg's observation report reflected that JS was able to answer questions and, as the class went over homework, JS "appeared to follow along and correct his answers if necessary," despite the presence of a disruptive student in the classroom.  (*Id.*)  Mr. Burg also noted that JS participated in a class discussion, copied his homework assignment in his assignment pad, and worked proficiently on his computer during a vocabulary exercise.  (*Id.*)

In June 2010, Christine Tone, JS's educational advisor at Eagle Hill, sent a letter to the Parents summarizing JS's performance during the 2009-2010 school year.  (District Ex. 9.)  Ms.

Tone stated that JS had made "huge gains in his interpersonal skills" including that he was "more available to suggestions, advice, and assistance from others," and was beginning to exhibit flexibility in certain peer interactions. (*Id.* at 1.) With regard to academics, Ms. Tone noted that JS was "respond[ing] well to the structure and routine of his classes," and his "ability to participate appropriately . . . has improved," which allowed him to share his ideas more effectively as well as listen to and appreciate the ideas and thoughts of others. (*Id.*) JS was "able to participate in small group tasks more effectively," and although Ms. Tone noted that "[c]ompromise and cooperation remain[ed] challenging," she also stated that JS was much more resilient when things did not go his way. (*Id.* at 1-2.) Overall, Ms. Tone believed that JS "had a very successful year, both academically and socially." (*Id.* at 2.) Enclosed with Ms. Tone's letter were reports from each of JS's teachers indicating the specific skills on which they had worked in each subject, JS's current performance in each skill, and a list of the special education supports that were used with JS in each classroom. (*See id.* at 3-17.)

The parties initially scheduled JS's annual review, at which the CSE would develop an IEP for the 2010-2011 school year, for June 10, 2010. (SRO Decision 4.) The Parents canceled the meeting, however, because: (1) they were awaiting receipt of updated academic testing by Dr. Gottesfeld; and (2) Eagle Hill had approached the Parents with a request that JS be placed in its residential program and the Parents wanted to get the opinions of JS's specialists before making that decision. (*Id.*; Ps' 56.1 Resp. ¶ 16.) Mr. Burg agreed to reschedule the meeting to a later date. (District Ex. 10.)

Dr. Gottesfeld completed his re-evaluation of JS in May 2010, and the Parents delivered it to the District on June 24, 2010. (Gottesfeld 2010 Report (Cover Letter).)[10] The report noted

---

[10] "Gottesfeld 2010 Report" refers to the May 17, 2010 Update Academic Assessment prepared by David Gottesfeld, Psy. D., based on his April and May 2010 observations of JS. (District Ex. 11.)

that the Parents requested the updated assessment to determine the quantitative and qualitative development of JS's academic skills after attending Eagle Hill for one year.  (*Id.* at 1.)  Dr. Gottesfeld observed JS for two hours on two different days, and his report reflected that JS was distracted and overly chatty at both sessions, though his "level of effort, overall demeanor, and attitude towards performing academic tasks" had vastly improved from his prior assessment.  (*Id.* at 2-3.)  Dr. Gottesfeld administered several of the same assessments he used in June 2009, and the report contained comparisons of JS's performance for each year.  (*See id.* at 3-7.)  The test results revealed that JS had made progress in several areas, including his overall reading, reading rate, accuracy and comprehension, and math calculation.  (*See id.*)  Dr. Gottesfeld indicated, however, that some of JS's results reflected a decrease in performance, which he believed was due to JS's lack of attention during the test session.  (*See id.* at 5.)  Dr. Gottesfeld concluded that JS had "demonstrat[ed] significant academic improvement and emotional growth" while at Eagle Hill, but believed that even with academic supports and accommodations, JS was not ready for a mainstream environment.  (*Id.* at 8.)

On August 9, 2010, the CSE convened to discuss JS's education program for the 2010-2011 school year – when JS would be in sixth grade – and to formulate his IEP for that year. (SRO Decision 5; D's 56.1 Resp. ¶ 4.)  Among those in attendance were Mr. Burg as chairperson, JS's mother, Carrie Merlo (a District school psychologist), Penny Weistrop (a District special education teacher), Martha Rosen (a District general education teacher), and Linda Glucksman (a parent member).[11]  (SRO Decision 5; 2010-11 IEP 6.)[12]  At the meeting, the

---

[11] A "parent member" is a parent of another disabled child or a child who was recently "declassified" as disabled who participates in the CSE to ensure that the parents understand the IEP-formulation process, are "comfortable" with the IEP team's decisions, and have "had their concerns adequately addressed."  N.Y.C. Dept. of Educ., *Parent IEP Team Member Training Session*, http://schools.nyc.gov/Academics/SpecialEducation/when-is-the-next/parentTeamMember.htm (last visited August 1, 2013).

CSE relied upon the Gottesfeld 2009 Report, the Gottesfeld 2010 Report, the February 18, 2010 classroom observation by Mr. Burg, the June 2010 progress reports from Eagle Hill, a July 2010 progress report from Eagle Hill, and letters dated July 2010 from Ms. Tone, July 9, 2010 from Dr. Klaus Schreiber (a psychiatrist who met with JS), July 15, 2010 from Dr. Gottesfeld, and August 5, 2010 from Dr. William Levinson (JS's pediatrician), all of which recommended JS be placed in Eagle Hill's residential boarding program.  (SRO Report 5; 2010-11 IEP 7; Tr. 58-65.)

During the meeting, the CSE discussed JS's present needs and developed a statement of present levels of performance in the areas of academic and functional performance and social/emotional performance.  (Tr. 76-82.)  The CSE recommended a general education setting, but proposed certain special education program and testing modifications and accommodations to address JS's needs, including:  direct consultant teacher services of three 40-minute sessions in a six-day cycle in English/language arts ("ELA") and math; resource room services 40 minutes per day; two 30-minute direct/indirect psychological consultation sessions in a six-day cycle; assistant teacher support (when not supported by a special education teacher) in ELA, writing workshop, math, science, and social studies; shared aide support in specials, physical education, and lunch; and two 40-minute parent counseling sessions per month.  (2010-11 IEP 1-3; *see* IHO Decision 3; SRO Decision 6.)  The 2010-11 IEP also indicated that JS was exempt from taking a foreign language.  (2010-11 IEP 6.)   In addition, the CSE set forth eighteen annual goals in the 2010-11 IEP, addressing the areas of study skills, reading, writing, mathematics, and social/emotional/behavioral skills.  (SRO Decision 5.)  The IEP reflected that the CSE considered a general education setting without support services but had rejected it because JS's needs required a more intensive setting.  (2010-11 IEP 7.)

[12] "2010-11 IEP" refers to the IEP developed for JS for the 2010-2011 school year at the August 9, 2010 CSE meeting.  (District Ex. 20.)

8

At the meeting, JS's mother indicated that she did not believe the District's middle school was appropriate for JS.  (*Id.*)  On August 17, 2010, she hand delivered a letter to Mr. Burg, which stated that the letter served as a "10 day notice" and that the Parents would be seeking tuition reimbursement for Eagle Hill for the 2010-2011 school year.  (District Ex. 18.)

The District sent the Parents a copy of JS's 2010-11 IEP on September 1, 2010.  (District Ex. 19.)  Although JS began school at Eagle Hill on September 7, 2010, JS's mother responded to the District's letter on September 20, 2010 and requested:  JS's proposed schedule; "a class profile, including the number of students in each class, the number of special education students, and a student to teacher ratio for each class; and the student to teacher ratio for the 'shared aide.'"  (District Ex. 21.)  JS's mother testified that despite JS's enrollment at Eagle Hill, she wanted more information about the District's offered program to "convince [herself] . . . [they] were doing the right thing . . . ."  (Tr. 278-79.)  Mr. Burg replied by letter dated September 28, 2010, inviting JS's mother to call him to discuss any outstanding questions or concerns she had regarding the program.  (District Ex. 22.)  In a letter dated September 30, 2010, JS's mother responded and requested the information be in writing.  (District Ex. 23.)  According to JS's mother, Mr. Burg never responded.  (Tr. 280.)

On December 6, 2010, the Parents faxed the District a due process complaint ("DPC") requesting an impartial hearing and alleging that the District failed to offer JS a FAPE for the 2010-11 school year.  (DPC ¶ 4.)[13]  The Parents alleged that the 2010-2011 IEP did not provide for adequate special education support and that the goals were miscalculated and failed to address JS's needs.  (*Id.* ¶¶ 18-30.)  The Parents contended that the IEP's recommended program failed to offer the student the "direct special education instruction" that he required, failed to

---

[13] "DPC" refers to the December 6, 2010 Impartial Hearing Request (also known as a Due Process Complaint) filed by the Parents.  (Parent Ex. C.)

recommend placement in a special class setting, and did not provide adequate counseling or skilled individual support.  (*Id.* ¶¶ 14-30, 39.)  Moreover, the Parents asserted that the CSE failed to perform a functional behavioral assessment ("FBA") or create a behavior intervention plan ("BIP"), and that the large number of modifications and supports in the IEP demonstrated the inappropriateness of the general education setting for JS.  (*Id.* ¶¶ 24, 28.)  The Parents also argued that placement in a mainstream setting failed to meet JS's special education needs as identified by Dr. Gottesfeld, (*id.* ¶ 19), and the District's middle school was too large and would cause JS to regress academically and behaviorally, (*id.* ¶¶ 15-16).  Finally, the Parents took issue with Mr. Burg's failure to provide them with a class profile and schedule as requested in their letters dated September 20 and 28, 2010.  (*Id.* ¶ 12.)  The Parents sought reimbursement from the District for the costs of JS's attendance at Eagle Hill for the 2010-2011 school year.  (*Id.* ("Proposed Resolution".)

An impartial hearing was held before the IHO on April 25-26, 2011 and May 4, 2011. (IHO Decision 1.)  The District, which bore the burden of proof, presented testimony by Mr. Burg.  (*Id.* at 2, 9.)  The Parents presented testimony by JS's mother, Dr. Gottesfeld, and Rayma Griffin, the parent liaison at Eagle Hill – and former director of admissions and placement for Eagle Hill – whom the Parents hired to represent Eagle Hill at the hearing.  (*Id.* at 4-8)  On September 4, 2011, the IHO issued a decision finding a violation of the IDEIA for the 2010-2011 school year and ordering the District to reimburse the Parents for the cost of tuition for the day program at Eagle Hill, but denying reimbursement for the residential boarding program.  (*Id.* at 16.)

The District appealed the ruling of the IHO, and the Parents cross-appealed.  (SRO Decision 1.)  The SRO received the administrative record, and on December 15, 2011, issued a

decision reversing the IHO with respect to the provision of a FAPE for the 2010-2011 school year.  (*See id.* at 12-20.)  The SRO therefore did not reach the question of whether Eagle Hill was an appropriate unilateral placement.  (*Id.* at 20.)

On April 12, 2012, the Parents initiated this action by filing the Complaint, seeking review of the SRO's decision pursuant to 20 U.S.C. § 1415(i)(2)(A).  (Doc. 1.)  I have received the administrative record from the SRO.  Neither party has introduced additional evidence before this Court.  The parties have cross-moved for summary judgment, as is customary in IDEIA cases.  (Docs. 7, 20.)

## II.  Applicable Legal Standard

The IDEIA serves to promote the education of children with disabilities.  *See, e.g.*, *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under the statute, states that receive federal funding must provide disabled children with a FAPE, 20 U.S.C. § 1412(a)(1), which includes "special education and related services" tailored to meet the unique needs of the particular child, *id.* § 1401(9); *see Rowley*, 458 U.S. at 181.

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational program tailored to provide appropriate educational benefits to individual disabled students." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child," *Walczak*, 142 F.3d at 122, and must comply with both the procedural and the substantive requirements of the IDEIA, *see* 20 U.S.C. § 1414.  Courts engage in a two-pronged review, asking first "whether the State complied with the procedures set forth in the Act" in developing

11

the IEP, and second, "whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012) (alteration and internal quotation marks omitted).  Only if the court finds that the IEP is deficient – either procedurally or substantively – does the court ask "whether the private schooling obtained by the parents is appropriate to the child's needs." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).  In fashioning relief, the court should take into account "equitable considerations relating to the reasonableness of the action taken by the parents." *Id.* (alteration and internal quotation marks omitted).

Among the procedural requirements of the IDEIA is that the IEP contain "measureable annual goals for the child" as well as "the method used to measure the student's progress toward those goals." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)).  In that regard, "the IEP [must] include short-term and long-term academic and nonacademic goals for each student, as well as evaluative procedures for measuring a student's progress in achieving the short- and long-term goals contained in the IEP." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 C.F.R. § 300.320(a)(2)-(3); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii)).

Substantively, the IDEIA "does not itself articulate any specific level of educational benefits that must be provided through an IEP" that would meet the "reasonably calculated to enable the child to receive educational benefits" standard.  *Walczak*, 142 F.3d at 129-30 (internal quotation marks omitted).  Courts interpreting the IDEIA make clear, however, that a school district is not required to furnish "'every special service necessary to maximize each handicapped child's potential,'" *A.C. ex. rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 173 (2d Cir.

2009) (quoting *Rowley*, 458 U.S. at 199); rather, a "district fulfills its substantive obligations

under the [IDEIA] if it provides an IEP that is likely to produce progress, not regression, and if

the IEP affords the student with an opportunity greater than mere trivial advancement," *Cerra v.

Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted).

The IEP need not "provide[] everything that might be thought desirable by loving parents,"

*Walczak*, 142 F.3d at 132 (internal quotation marks omitted); it need only provide the child with

a "basic floor of opportunity," *Rowley*, 458 U.S. at 200.  Additionally, the "services must be

provided in the least restrictive setting consistent with a child's needs."  *Walczak*, 142 F.3d at

122.

Motions for summary judgment customarily resolve IDEIA actions in federal court.  *See

Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the

IDEIA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the

motion.  *See id*.  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing

administrative decisions."  *T.P.*, 554 F.3d at 252 (internal quotation marks omitted).  In

reviewing an action pursuant to Section 1415(i) of the IDEIA, the district court "(i) shall receive

the records of the administrative proceedings; (ii) shall hear additional evidence at the request of

a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief

as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see Grim v. Rhinebeck Cent.

Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003).

Although the court engages in an independent review of the administrative record and

makes a determination based on the preponderance of the evidence, its review of the state

administrative decisions is limited.  *See Rowley*, 458 U.S. at 205-06; *M.H.*, 685 F.3d at 240;

*Walczak*, 142 F.3d at 129.  "While federal courts do not simply rubber stamp administrative

decisions, they are expected to give *due weight* to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (emphasis added) (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 244.  In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244.  The court's determination "must also be colored by an acute awareness of institutional competence and role." *Id.*  Thus, more deference should be granted to "determinations regarding the substantive adequacy of the IEP" than to determinations regarding procedural adequacy.  *Id.*  Deference to administrative decisions is particularly warranted where the district court's review, as here, "is based entirely on the same evidence as that before the SRO." *Id.*

The SRO's or IHO's factual findings should be "reasoned and supported by the record" to warrant deference.  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2011).  Where the IHO and the SRO have reached contrary conclusions, courts generally "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *A.C.*, 553 F.3d at 171 (internal quotation marks omitted); *see M.H.*, 685 F.3d at 246 (Unless one decision is "insufficiently reasoned to merit . . . deference," "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination.").  "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *Id.*

14

(internal quotation marks omitted).  This is especially true when the SRO's "review has been thorough and careful."  *Walczak*, 142 F.3d at 129; *see R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned . . . .").

## III.  Discussion

For the reasons stated below, I see no reason to disturb the SRO's decision, because I find it to be supported by a preponderance of evidence in the record.

A. *Procedural Compliance*

"The initial procedural inquiry is no mere formality," *Walczak*, 142 F.3d at 129, as the IDEIA's procedural guarantees are a "safeguard against arbitrary or erroneous decisionmaking," *Evans v. Bd. of Educ.*, 930 F. Supp. 83, 93 (S.D.N.Y. 1996) (internal quotation marks omitted).  Both the courts and the legislature "place great importance on the procedural provisions" incorporated in the IDEIA, and thus violating the IDEIA's procedural guarantees "may be a sufficient ground for holding that a school system has failed to provide a [FAPE]."  *Id.*  Of course, not every procedural flaw will automatically require a finding of a denial of a FAPE.  *See M.H.*, 685 F.3d at 245.  Relief will be warranted, however, if the procedural inadequacies "(I) impeded the child's right to a FAPE; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child; or (III) caused a deprivation of educational benefits."  *Id.* (alterations and internal quotation marks omitted).

The Parents raise four claims of procedural error:  (1) the August 9, 2010 CSE was improperly composed; (2) the CSE lacked sufficient information with which to formulate JS's IEP for the 2010-2011 school year; (3) the CSE failed to duly consider the available

documentation; and (4) the CSE improperly repeated goals from the 2009-2010 IEP.  (Ps' Mem. 7-12.)  Defendant's principal contention is that the alleged procedural violations are not properly before the Court because the Parents failed to raise them in their DPC.  (D's Opp. 6.)[14] Defendant further contends that even if the Court may consider these issues, the alleged procedural violations did not deny JS a FAPE.  (*Id.* at 8.)

       i.    <u>Issues Properly Before the Court</u>

       There are statutory and regulatory limits to the scope of judicial review of administrative decisions under the IDEIA.  I therefore must consider these threshold issues first.

       The IDEIA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [DPC], unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  Accordingly, "the party requesting the hearing [must] lay out specifically in the [DPC] the issues that will be before the hearing officer," *C.F. v. N.Y.C. Dep't of Educ.*, No. 11-CV-157, 2011 WL 5130101, at *12 (S.D.N.Y. Oct. 28, 2011), and courts have authority to review only those issues, *see B.P. v. N.Y.C. Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by the Defendant."); *M.R. v. S. Orangetown Cent. Sch. Dist.*, No. 10-CV-1800, 2011 WL 6307563, at *13 (S.D.N.Y. Dec. 16, 2011) ("[T]here is a statutory bar to the IHO considering issues not raised in the demand for a due process hearing, absent the district's or IHO's consent to a timely amendment.") (citation omitted).  Administrative remedies are not exhausted as to issues not raised in the DPC, and failure to exhaust deprives the district

---

[14] "D's Opp." refers to the Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment.  (Doc. 24.)

court of subject matter jurisdiction.  *See A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 216 (S.D.N.Y. 2010).

Before this Court, the Parents argue for the first time that the CSE was not properly composed.  Because this issue was not addressed in the administrative proceedings, I will not consider it.[15]  I do agree with the IHO and the SRO, however, that the Parents' DPC raised the issues of whether the CSE adequately considered the available information in formulating JS's IEP and whether the goals in the 2010-2011 IEP were improperly repeated.[16]  (SRO Decision 13, 17-18; IHO Decision 11; *see* DPC ¶¶ 19, 21, 29.)  Thus, the only remaining threshold issue – on which the IHO and SRO disagreed – is whether the Parents' contended in their DPC that the CSE lacked sufficient information to develop the IEP.

The IHO found that the reports and assessments relied upon by the District were not sufficiently complete for the purposes of designing JS's IEP.  (*See* IHO Decision 11-12.)  On that basis, the IHO concluded that the IEP formulated for JS "did not develop a suitable program calculated to confer a reasonable education benefit and thus failed to provide [a] FAPE" to JS.  (*Id.* at 12.)

The SRO, however, found that the DPC did not include the issue of whether there was adequate information to formulate an IEP for JS, and therefore the IHO exceeded the scope of the hearing request when he concluded that the CSE lacked sufficient information to determine JS's needs.  (SRO Decision 13-14.)  Moreover, the SRO determined that neither party was even

---

[15] To the extent the IHO's decision can be construed as making an adverse factual finding that the CSE was improperly composed, (*see* IHO Decision 11 ("Yet there was no one serving on the CSE of August 9, 2010 who can be said to have had any basis for knowing the child's then 'current needs.'")), I find that such a determination would impermissibly exceed the scope of the impartial hearing, as it was not raised in the Parents' DPC.  To the extent this comment refers to the sufficiency of the information before the CSE, I discuss that issue below.

[16] By deciding whether the 2010-2011 IEP impermissibly repeated goals from the prior year's IEP, the SRO and IHO implied that the Parents had raised the issue in their DPC.  Although I find their reading of the DPC to be generous, because there is testimony concerning the issue from the impartial hearing, it was evaluated by both the IHO and SRO, and it in any event is not dispositive, I will consider it in resolving the motion.

contending that the CSE did not have adequate information to develop the IEP; rather, the disagreement between the parties centered on whether the CSE gave due consideration to the available information.  (*Id.* at 13.)

The Parents appear to concede that the issue as to whether the CSE lacked sufficient information is not in their DPC, but argue that nonetheless the IHO's decision was proper because the District had "opened the door" to the issue on direct examination of Mr. Burg.  (Ps' Mem. 8 (citing *M.H.*, 685 F.3d at 250).)  The Parents' argument is not persuasive for two reasons.  First, Mr. Burg at the impartial hearing merely offered background and foundation testimony about the information the CSE considered.  (*See* Tr. 56-70, 80-82, 103.)  The District's counsel did not ask him any questions nor did he offer any testimony as to the adequacy of that information.  (*Id.*)  In *M.H.*, in contrast, the court found that the school district had introduced detailed evidence of the appropriateness of various teaching methodologies – not mentioned in the parents' DPC – in both counsel's opening statement and direct examination. *See M.H.*, 685 F.3d at 250; *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 149-52 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012).

Furthermore, even if the District had opened the door – which it did not – the Parents' counsel conceded in his opening statement (which followed Mr. Burg's testimony) that the CSE "had sufficient documentation in front of it to make a timely recommendation prior to the beginning of the school year."  (Tr. 228.)  Thus, it was inappropriate for the IHO to determine that the CSE lacked adequate information to formulate the IEP, where the Parents failed to raise any such claim in their DPC and in fact advanced the opposite view.

Accordingly, I agree with the SRO that the IHO should not have decided whether there was adequate information to formulate an IEP, and therefore conclude that I do not have the

authority to review this issue.  *See C.F.*, 2011 WL 5130101, at \*12; *Bruschini v. Bd. of Educ.*, 911 F. Supp. 104, 107-08 (S.D.N.Y. 1995).

In light of the above, I will consider in connection with the IEP's procedural compliance with the IDEIA only whether the CSE gave adequate consideration to the evaluative information it had at its August meeting and/or impermissibly repeated the annual goals from a prior year's IEP.

      ii.    <u>Consideration of Evaluative Information</u>

The Parents argue that the CSE, without comment or explanation, and based solely on Mr. Burg's advice, failed to consider any of the available evaluations of JS in rejecting a residential placement recommendation at the August 9, 2010 meeting.  (Ps' Mem. 9.)

The IHO determined that "[t]here is no indication in the record that any part of Dr. Gottesfeld's report was seriously considered by the CSE."  (IHO Decision 11.)  The IHO further concluded that the CSE had no expertise of its own on which to rely, and therefore its rejection of Dr. Gottesfeld's recommendation, without offering its own persuasive evaluation, denied JS a FAPE for the 2010-2011 school year.[17]   (*Id.* at 12.)

The SRO disagreed, and found that a review of the 2010-2011 IEP revealed that the CSE utilized Dr. Gottesfeld's 2009 Report to develop JS's present levels of academic and social/emotional performance and his program modifications, as well as to determine the placement recommendation for JS.  (SRO Decision 15.)  The SRO walked through the 2010-

---

[17] The IHO noted that if the District did not find Dr. Gottesfeld's evaluation persuasive, it should have offered its own evaluation.  (*Id.* at 11-12.)  The SRO, however, found that the IHO articulated an inappropriate standard and heightened the District's burden of proof beyond what the IDEIA or State regulations intended.  (SRO Decision 14 n.7.)  The IDEIA requires a district to (1) ensure that adequate evaluative information has been obtained with regard to the student's areas of need, (2) consider any other information provided by the parents, including private evaluations, and (3) recommend an IEP that was reasonably calculated to enable the student to receive educational benefits. . . ."  (*Id.*)  To the extent the IHO's decision that the District failed to provide JS a FAPE was based on his conclusion that the District was required to or should have offered its own evaluation, I concur with the SRO that the statute does not go so far.

2011 IEP and, in full detail, described the content that was drawn directly from the test results, observations, or assessments contained in Dr. Gottesfeld's 2009 report, as well as from the other documentation that the CSE had before it – including the Gottesfeld 2010 Report – at the August 2009 meeting.  (*See id.* at 15-16.)  The SRO also relied on hearing testimony from both Mr. Burg and Dr. Gottesfeld that JS's present levels of performance were consistent with the information provided in the reports, (*id.* at 16), and reasonably concluded that the CSE appropriately considered all the available information when developing JS's IEP.  Furthermore, the SRO did not concur with the IHO that the CSE had no basis to depart from Dr. Gottesfeld's recommendation, as the SRO found that Dr. Gottesfeld's interpretation of JS's needs was inconsistent with his 2009 test results.  (*Id.*)  The SRO thus concluded that the CSE appropriately considered the information before it when developing JS's IEP, and accordingly annulled the IHO's decision that JS was denied a FAPE on that basis.  (*Id.* at 16-17.)

The Parents' main objection seems to focus not on the CSE's failure to duly consider the available information, but rather on the CSE's failure to adopt Dr. Gottesfeld's specific recommendation despite utilizing his report in developing the IEP.  The SRO concluded, and I agree, that the CSE had reason to depart from Dr. Gottesfeld's recommendation that JS required placement in Eagle Hill.  (*Id.*)  The raw scores contained in Dr. Gottesfeld's 2010 Report appeared to reveal that JS had regressed in some academic areas while at Eagle Hill.  (*See* Tr. 409-11.)  Dr. Gottesfeld explained, however, that if one analyzed JS's qualitative performance, such as the grade level that corresponded to the raw score, it was evident that JS had achieved progress.  (*See* Tr. 409-12, 419-21, 427-28.)  Overall, the evaluation reflected, and Dr. Gottesfeld agreed, that JS's academic functional level was in the average range.  (*See* Gottesfeld 2009 Report 8-10; Tr. 430-31.)  On this basis, the SRO reasonably concluded that the CSE acted

sensibly in deciding that JS did not need a setting as restrictive and specialized as Eagle Hill. Because the evaluation's results and the other evidence did not support Dr. Gottesfeld's recommendation that a setting such as Eagle Hill was required in order for JS's IEP to be reasonably calculated to receive educational benefits, the CSE's recommendation was appropriate.[18]  (SRO Decision 16 (citing Gottesfeld 2009 Report 17-18).)

More fundamentally, the law does not require an IEP to adopt the particular recommendation of an expert; it only requires that that recommendation be considered in developing the IEP.  *See E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010) ("The mere fact that a separately hired expert has recommended different programming does nothing to change the deference to the district and its trained educators.") (alterations and internal quotation marks omitted), *aff'd*, 487 F. App'x 619 (2d Cir. 2012); *cf. H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at *16 (S.D.N.Y. May 24, 2012) (rejecting specific recommendation of family's private audiologist is not a denial of FAPE if the "device employed is reasonably calculated to allow the child to receive educational benefits"), *aff'd*, No. 12-CV-2464, 2013 WL 3155869 (2d Cir. June 24, 2013).

---

[18] The Parents contend that the SRO erred by concluding that Dr. Gottesfeld's recommendation was inconsistent with JS's test results because Dr. Gottesfeld was not the only individual to recommend such a placement; indeed, the Parents provided the CSE with letters from three other individuals, all of whom recommended a residential placement for JS.  (Ps' Mem. 10.)  The IHO, however, did not find these letters persuasive because (1) they were inconsistent with testimony and documents that evaluated JS's needs and progress without reference to residential placement; (2) three of the letters were not based on independent evaluations, but were instead solicited by the Parents to support their claims for tuition reimbursement from the District; and (3) JS's mother's testimony suggested that the residential program served the family's interest more than JS's unique educational needs.  (IHO Decision 13-14.)  I agree with the IHO's analysis, and do not think that the relatively low weight the CSE seemed to ascribe these letters was inappropriate or misguided.  Furthermore, although Dr. Gottesfeld's ultimate recommendation for JS was placement at Eagle Hill, he also concluded that "a self-contained special education class in the public school" would be entirely inappropriate.  (Gottesfeld 2009 Report 16.)  Based on the foregoing, it was reasonable for the SRO to conclude that Dr. Gottesfeld's recommendation was inconsistent with the test results, and that the CSE properly determined that placement in a general education classroom in the District middle school (with supports) was the "least restrictive setting consistent with [JS's] needs."  *Grim*, 346 F.3d at 379 (internal quotation marks omitted).

Thus, I concur with the SRO that the CSE appropriately considered the information before it when developing JS's IEP and that JS was not denied a FAPE on this basis.

    iii.   <u>Annual Goals</u>

The Parents contend that the SRO erred in concluding that the CSE's repetition of goals from the 2009-2010 IEP was permissible because the goals in the prior year's IEP were miscalculated and did not respond to all of JS's academic needs. (Ps' Mem. 11.)

The IHO concluded that it was improper for the CSE to draw some of the 2010-2011 IEP annual goals from the 2009-2010 IEP because the Parents had criticized the prior year's IEP and any lack of success with the IEP's program could not be blamed on alleged failures with Eagle Hill. (IHO Decision 11.) The SRO disagreed, and found that the annual goals on JS's 2010-2011 IEP correlated directly with his needs. (SHO Decision 17.) The SRO acknowledged that the 2010-2011 IEP contained annual goals that were similar to those on the previous IEP, but reasoned that the goals were permissible because JS's needs had not changed significantly since his prior IEP. (*Id.*)

The IDEIA requires that an IEP be "updated annually," but revised only "as appropriate." *M.H.*, 685 F.3d at 256 (internal quotation marks omitted). If, under a particular IEP, a student made no progress, using an identical IEP the following year would be questionable. *See Schroll v. Bd. of Educ.*, No. 06-CV-2200, 2007 WL 2681207, at *5 (C.D. Ill. Aug. 10, 2007). An IEP is not inappropriate, however, "simply because it does not change significantly on an annual basis." *Id.*

I agree with the SRO that, in light of JS's academic needs remaining substantially the same, the CSE's decision to draw from the prior IEP did not result in the denial of a FAPE. Although several goals from the 2009-2010 IEP are repeated on the 2010-2011 IEP, (*compare*

2010-11 IEP 7-10, *with* 2009-10 IEP 6-8),[19] the hearing record indicates that JS's needs had not

changed significantly since the prior IEP. Mr. Burg testified that there was consensus at the

meeting that JS's needs were "clearly evident and substantially similar" to the prior year and that

the annual goals "were still consistent" with JS's needs. (Tr. 139-40.) Mr. Burg testified further

that at least one of the goals was adjusted, the goals' language was adjusted in some respects,

and because the academic goals were not added until January 2009, they were still considered

relatively new. (*Id.* at 140, 151.) A review of the IEPs at issue is consistent with Mr. Burg's

testimony that the CSE made adjustments, as two goals were not repeated from the 2009-2010

IEP, two new goals were added, and some of the language was modified. (*See* 2010-11 IEP 7-

10; 2009-10 IEP 6-8.) Moreover, JS's mother testified that she reviewed the goals prior to the

CSE meeting and provided the CSE with comments regarding the goals, and in response to her

comments, the CSE made "some changes to some of the goals." (Tr. 358-59.) Finally, as to the

propriety of the goals themselves, deference to the reasoned conclusions of the SRO as the final

state administrative determination is appropriate. *See M.H.*, 685 F.3d at 244. Indeed, "the

sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the

[IDEIA] requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at

382.

　　　　To the extent there is some similarity between goals from year to year, such continuity

makes sense. Modeling an IEP after the prior year's IEP, with appropriate changes, is a sensible

practice that, as long as it is not done reflexively and without consideration of the student's

individual circumstances and needs, does not signify that the student is likely to regress. *See*

---

[19] "2009-10 IEP" refers to the 2009-2010 IEP developed for JS in 2009. (Parent Ex. H.)

*M.H.*, 685 F.3d at 256 (no procedural violation even where IEP's goals were photocopied from prior year's IEP when goals "remained appropriate").

Accordingly, I agree with the SRO that the CSE's use of the prior goals in formulating the 2010-2011 IEP is not a procedural violation that denied JS a FAPE.

B. *Substantive Compliance*

The Parents raise several issues with regard to whether JS's 2010-2011 IEP substantively complied with the IDEIA, but their complaints focus more on the District's purported failure to establish at the impartial hearing how the recommended supports would benefit JS or be appropriate for his needs, and less on the sufficiency of the supports themselves. (*See e.g.*, Ps' Mem. 13-14 ("Defendant also failed to establish in their direct case how the resource room would be appropriate to meet J.S.'s significant needs.").) Defendant contends that the 2010-2011 IEP offered JS an educational program "reasonably calculated to enable [JS] to receive educational benefits," and that the Parents are seeking a standard of perfection beyond what the IDEIA mandates. (D's Opp. 13-17 (citing *Walczak*, 142 F.3d at 122).)

In light of the IHO's determination that the CSE's procedural violations denied JS a FAPE for the 2010-2011 school year, he did not engage in any analysis of the CSE's recommended placement. Particularly because the IHO did not reach the issue, and because the SRO's reasoning is persuasive, the SRO's decision is entitled to deference. *See M.H.*, 685 F.3d at 244; *R.E.*, 694 F.3d at 189; *cf. Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy.").

The Parents argue, in conclusory fashion, that the modifications and accommodations recommended for the 2010-2011 school year – of which there are many – could not be

appropriately implemented within a general education classroom.[20]  (Ps' Mem. 13.)  But, as the

SRO noted, JS would be supported by a special education teacher in English, writers' workshop,

and math every other day, and an assistant teacher every day when the special education teacher

was not in these classes.  (SRO Decision 18.)  Further, the IEP proposed that JS would be

supported by an assistant teacher in science and social studies, and would be supported by an

aide in "specials," gym, and lunch.  (*Id.*)  The special education teacher role would have included

supporting JS's IEP goals, monitoring his behavior and organization in class, making sure the

student's program modifications were implemented appropriately, consulting with his

mainstream teachers, communicating with JS's entire team, and serving as the primary contact

and support for the student.  (*Id.*)  The Parents argue that this was insufficient because the special

education teacher would not be working one-to-one with JS and that JS did not want an aide

because it drew unwanted attention to him.  (Ps' Mem. 13; Tr. 403.)  Even at Eagle Hill,

however, the teacher was not working one-to-one with JS, (*see* Tr. 253 ("Every class was taught

by a special education teacher. . . . Some classes had five children.  I think the largest might have

had ten.")), and although JS's discomfort with classroom support is understandable, it is

outweighed by the IDEIA's preference for mainstreaming, *see Oberti v. Bd. of Educ.*, 995 F.2d

1204, 1216 (3d Cir. 1993) (when mainstreaming a child, IDEIA requires schools "to provide

supplementary aids and services to enable children with disabilities to learn whenever possible in

a regular classroom").

---

[20] The Parents contend that the "sheer number of supports, modifications, and accommodations that the District
thought would be necessary" if JS were placed in a mainstream setting demonstrates the absurdity of the District's
recommendation.  (Ps' Mem. 13.)  There is no evidence, however, that the proposed program would not be workable
in practice.  Moreover, it is necessary to be mindful of the IDEIA's strong preference for "'mainstreaming,' or
educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers," *M.H.*,
685 F.3d at 224 (alteration and internal quotation marks omitted), which the CSE considered in developing JS's IEP,
(*see* Tr. 133).

Concerning the resource room, the Parents object to the District's failure to explain which resource room JS would be placed in, who his teacher would be, and which students would be in the room with him.  (Ps' Mem. 14.)  The Parents do not explain, however, how failing to provide this information was a *substantive* violation resulting in the denial of a FAPE.  *See A.C.*, 553 F.3d at 173 ("A school district fulfills its substantive obligations under the [IDEIA] if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement.") (alteration and internal quotation marks omitted).  As discussed above, the resource room was one of a number of supports and accommodations the District proposed, and the Parents have not put forth any reason, nor did the SRO find one, not to rely on Mr. Burg's testimony that the resource room is a "safe home base" for students that would help JS meet his IEP goals and feel emotionally supported.  (Tr. 90-91.) Furthermore, the Parents cite to no provision in the IDEIA – nor have I found one – that requires the IEP to contain the specific information the Parents claim to be necessary.

The Parents further contend that the IEP did not provide JS with the appropriate support to address his social and emotional needs, primarily because direct services were not offered. (Ps' Mem. 14.)  As the SRO noted, however, the IEP did offer JS thirty minutes of direct counseling with the school psychologist per six-day cycle.  (2010-11 IEP 1; Tr. 92; SRO Decision 19.)  In addition to direct counseling, under the IEP the school psychologist would also work closely with JS's aides and assistant teachers to monitor and support his behavior throughout the day and to implement behavior plans, as appropriate.  (Tr. 94; SRO Decision 19.) Furthermore, as the SRO pointed out, Mr. Burg testified that JS would be able to come into the school psychologist's office if necessary or visit the middle school guidance counselor when in need of support.  (Tr. 94-95; SRO Decision 19.)  The Parents contend that the District's

recommendation that they, too, receive counseling and training twice per month demonstrates the District's belief that it was unable to provide JS with sufficient support. (Ps' Mem. 14.) Although the Parents claim that this suggests a therapeutic boarding school was necessary, the IEP reflected that JS was able to control his behavior at school. (2010-11 IEP 19.) As the SRO reasonably concluded, the parent counseling and training was recommended to help the Parents manage JS's frequent and intense outbursts of anger at home. (SRO Decision 19; Tr. 93-94.)[21]

Finally, the Parents object to the CSE's failure to develop a BIP before the school year started. (P's Mem. 15.) The SRO relied on Mr. Burg's testimony that the BIP would have been put into place by the school psychologist who would initially perform an FBA after JS began school. (SRO Decision 19; Tr. 102). Based on this testimony and case law finding that in certain circumstances a district can wait until after a student begins to attend a district school to conduct an FBA, (SRO Decision 19 n.11), the SRO reasonably concluded that the District's failure to develop a BIP before the school year did not render the IEP legally inadequate. (*Id.* at 19 (citing *Cabouli v. Chappaqua Cent. Sch. Dist.*, 202 F. App'x 519, 522 (2d Cir. 2006) (summary order) (IEP not substantively flawed where FBA was not required until student enrolled at school); *S.H. ex rel. W.H. v. Eastchester Union Free Sch. Dist.*, No. 10-CV-3927, 2011 WL 6108523, at *9 (S.D.N.Y. Dec. 8, 2011) (failure to conduct FBA not denial of FAPE

---

[21] The Parents also contend that the SRO erred by comparing the 2008-2009 and the 2010-2011 IEPs to demonstrate that placement in the District was appropriate, because the IHO's findings were based on the similarities between the 2009-2010 and 2010-2011 IEPs. (Ps' Mem. 15.) The Parents' argument mischaracterizes the SRO's use of the 2008-2009 IEP. By comparing the 2008-2009 and 2010-2011 IEPs, the SRO was refuting the Parents' assertion that the District had offered JS a substantially similar program since his fourth-grade year, not engaging in a discussion of why repetition of goals from the 2009-2010 IEP was proper – which the SRO had already done. (*See* SRO Decision 19 ("Moreover, contrary to the contention that the district has offered a substantially similar program since the student's fourth grade, a comparison of the services recommended in the student's 2008-09 fourth grade IEP with those recommended in the 2010-11 IEP reveals that the 2010-11 IEP increased the level of support provided to the student . . . .").) Furthermore, even if the SRO did erroneously compare the 2008-2009 and 2010-2011 IEPs, any error would be harmless, as the Parents contended that "the 2009-2010 IEP was virtually identical to the 2008-2009 IEP." (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Ps' Opp."), (Doc. 28), 8.)

where IEP indicated FBA "would be conducted and a [BIP] would be implemented at the

beginning of the . . . school year"); *see also M.W. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2720,

2013 WL 3868594, at *6 (2d Cir. July 29, 2013) (IEP developed without FBA not legally

inadequate if IEP "identifies student's behavioral impediments and implements strategies to

address that behavior").)  "[T]he sufficiency of a district's behavioral intervention strategy is

precisely the type of issue upon which the [IDEIA] requires deference to the expertise of the

administrative officers."  *C.F.*, 2011 WL 5130101, at *9 (internal quotation marks omitted).

> For the foregoing reasons, I do not disturb the SRO's finding that the hearing record

reflects that the District proved by a preponderance of the evidence that the CSE recommended a

combination of services that collectively addressed JS's needs, and thus that JS was not deprived

of a FAPE for the 2010-2011 school year.

C.  *Appropriate Placement and Reimbursement*

> In light of my disposition that the District offered JS a FAPE for the 2010-2011 school year, I

need not reach the issue of whether the Parents' unilateral placement at Eagle Hill was

appropriate or whether equitable considerations support the Parents' claim for tuition

reimbursement.

*        *        *

> I understand why the Parents may feel that Eagle Hill is the best placement for their

child, but I am bound by the IDEIA, which does not require the best placement, just one at which

the student may make educational progress – that is, one likely to produce progress, not

regression.  *See Walczak*, 142 F.3d at 132 (IDEIA guarantees "appropriate" education not

"everything that might be thought desirable by loving parents") (internal quotation marks

omitted); *S.H.*, 2011 WL 6108523, at *10 (IDEIA does not require "that an IEP furnish every

28

special service necessary to maximize each handicapped child's potential") (internal quotation marks omitted).

**IV.** <u>**Conclusion**</u>

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 7, 20), enter judgment for the Defendant, and close the case.

**SO ORDERED.**

Dated:  August 5, 2013
          White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.